# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| SAINT PAUL'S COLLEGE, | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE** |
| | ) | |
| v. | ) | |
| | ) | NO. _____ |
| THE SOUTHERN ASSOCIATION | ) | |
| OF COLLEGES AND SCHOOLS, | ) | |
| INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## VERIFIED COMPLAINT

Plaintiff, Saint Paul's College ("Saint Paul's" or the "College"), files this

action to reverse the decision by Defendant, The Southern Association of Colleges

and Schools, Inc. ("SACS" or the "Commission" or the "Defendant") removing the

College from membership and thereby revoking its accreditation.  In support of its

Verified Complaint, Saint Paul's states the following:

## INTRODUCTION

This action is filed to prevent the destruction of Saint Paul's.  Founded in

Lawrenceville, Virginia in 1888 and historically affiliated with but separate from

the Episcopal Church, Saint Paul's is a private, historically black, four-year

coeducational institution.  The College has carried out a vital education and social

need for over more than 120 years through, among other things, serving underserved populations.  Among its unique programs is the only Single Parent Support System initiative for degree-seeking single parents in Virginia.

The Commission, the regional accrediting body for the Commonwealth of Virginia, violated its own procedures and fundamental due process by removing the College from its membership resulting in revocation of accreditation.  This revocation – if not reversed – has and will continue to cause irreparable harm, including among other things, the loss of federal and other financial aid and resources, student withdrawal, reputational harm to Saint Paul's, and ultimately the demise of the College.

## PARTIES

1.      Saint Paul's, a Virginia not-for-profit corporation, is a private, church-related residential four-year college located in Lawrenceville, Virginia.  The College is affiliated with the Episcopal Church.  On September 24, 1888, the Reverend James Solomon Russell of the Protestant Episcopal Church founded the Saint Paul Normal and Industrial School with fewer than a dozen students.  When founded, the College was intended chiefly to develop African American teachers.

2.      In 1941, the school's name was changed to Saint Paul's Polytechnic Institute when the Commonwealth of Virginia granted the College authority to

offer a four-year program.  The first bachelor's degree was awarded in 1944.  In 1957 the College adopted its present name to reflect more accurately its liberal arts and teacher education curricula.

3.     SACS is a nonprofit corporation incorporated under the laws of the State of Georgia with its principal place of business located in Decatur, Georgia. SACS operates through "commissions," including the Commission on Colleges. The Commission on Colleges of SACS[1] is the only regional accrediting association recognized by the Secretary of the United States Department of Education for the purpose of bestowing institution-wide accreditation on institutions of higher education in Virginia and ten other southern states, Alabama, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Florida, Tennessee, and Texas.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action under one or more of the following statutory provisions: (1) 20 U.S.C. 1099b(f), providing exclusive federal jurisdiction for disputes with recognized accrediting agencies; (2) 28 U.S.C. § 1343(a)(4) in that Saint Paul's seeks equitable relief under the Higher Education Act of 1965, as amended, 20 U.S.C. § 1099b(f), for the

---

[1]     The acronym "SACS" will also refer to the SACS Commission on Colleges.

protection of civil rights; (3) 28 U.S.C. § 1331 in that this action arises under the laws of the United States, including federal common law due process and the Higher Education Act Amendments of 1992, as amended, 20 U.S.C. § 1001, *et seq*; and (4) 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Saint Paul's and SACS and the amount in controversy between the College and the Defendant exceeds $75,000, exclusive of interest and costs.

5.     This Court has jurisdiction over SACS.

6.     Venue for this action lies in this judicial district and division under 28 U.S.C. § 1391(a) and (b) and pursuant to a forum selection clause within SACS' written policies.

## **BACKGROUND**

### *Accreditation and Reaffirmation*

7.     SACS is a private accrediting agency recognized by the United States Department of Education pursuant to 34 C.F.R. § 602, *et seq*, and is the regional body for the accreditation of higher education institutions in Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia that award associate, baccalaureate, masters or doctoral degrees.

8.      Pursuant to notice and comment in the Federal Register, the Department of Education promulgates policies and procedures, which then form the foundation for policies and procedures enacted by accrediting agencies.

9.      SACS' policies and procedures are fashioned upon the Department of Education's policies and procedures.

10.     SACS has published a document entitled "*Principles of Accreditation: Foundations for Quality Enhancement*" ("*Principles of Accreditation*" or "*Principles*").  The *Principles* contain published accreditation standards that SACS applies to institutions of higher education and is attached hereto as **<u>Exhibit A</u>**.

11.     All institutions accredited by the Commission are required to undergo a review for reaffirmation of accreditation every ten years.  The review evaluates the institution's compliance with the Commission's *Principles of Accreditation* in three areas: "Core Requirements"; "Comprehensive Standards"; and "Federal Requirements."

12.     Under the Higher Education Act, a college's eligibility to receive federal funding and other funding, including financial aid for students, is *contingent* upon the college's continued membership in a recognized regional accreditation association. 34 C.F.R. pt. 600.  Thus, a loss of accreditation may

result in a death sentence for a small, private educational institution like Saint Paul's, where 100% of its current students receive Federal financial aid.

### The College's Reaffirmation Efforts

13.   Saint Paul's was awarded its initial SACS accreditation in 1950.  In December 2000, SACS denied reaffirmation of the College's accreditation and placed it on "Notice" for failing to comply with the *Principles of Accreditation*'s provisions related mainly to institutional commitment and finances.  Prior to December 2001, Saint Paul's submitted its "First Follow-Up Report."  After reviewing the First Follow-Up Report, SACS removed the "Notice" regarding Saint Paul's.

14.   From September 29 through October 1, 2009, the SACS Reaffirmation Committee conducted a review for reaffirmation of Saint Paul's accreditation and subsequently issued its Report of the Reaffirmation Committee. In its report, the Reaffirmation Committee cited eighteen recommendations.  The report is attached hereto as **Exhibit B**.  On February 28, 2010, Saint Paul's submitted its Response Report to the Visiting Committee.  The response is attached hereto as **Exhibit C**.

15.     On June 22, 2010, the SACS Committee on Compliance and Reports conducted an interview with the College's administrators regarding the 2009 review for reaffirmation of Saint Paul's accreditation.

16.     On July 8, 2010, Dr. Belle Wheelan, President of SACS Commission on College, notified Saint Paul's that the SACS Board of Trustees decided to continue its accreditation, but denied reaffirmation and placed the College on "Probation" for twelve months for its failure to comply with fourteen Core Requirements and Comprehensive Standards within the *Principles of Accreditation*.  The notification is attached hereto as **Exhibit D**.

17.     On January 1, 2011, the College submitted its First Monitoring Report for the Reaffirmation of Accreditation to SACS in anticipation of the SACS Special Committee's visit on February 9 -11, 2011.   The report is attached hereto as **Exhibit E**.

18.     On March 25, 2011, SACS provided the Report of the Special Committee regarding its February 9-11, 2011 review.  The report is attached hereto as **Exhibit F**.  On July 8, 2011, SACS, again, continued Saint Paul's accreditation, but denied reaffirmation of accreditation and again placed it on probation for 12 months for failure to comply with all provisions of the *Principles of Accreditation*. The letter is attached hereto as **Exhibit G**.

19.     On March 1, 2012, the College submitted its Second Monitoring Report to SACS.  The report is attached hereto as **Exhibit H**.

20.     On April 15-18, 2012, the SACS Special Committee visited Saint Paul's campus to assess its compliance with the *Principles of Accreditation*.

21.     On June 21, 2012, the SACS Board of Trustees, based on the recommendation of the Special Committee, voted to remove the College from SACS membership.

22.     On July 3, 2012, Saint Paul's received SACS June 28, 2012 formal notification letter informing the College of the Board of Trustees' decision to remove it from SACS membership.   The letter is attached hereto as **Exhibit I**.

### *Appeal of June 28ᵗʰ Removal of Accreditation Letter*

23.     In July 2012, Saint Paul's submitted a timely notice of appeal to the SACS Appeals Committee, identifying the procedural and substantive issues that justify a different determination, specifically, that SACS failed to consider "Good Cause" in its initial and final decisions as is required under the Removal Policy, *see* Exhibit O, and that SACS' policies and procedures were arbitrarily applied and enforced, including that SACS, without informing Saint Paul's, required audited financial reports to prove compliance.

24.     On August 6, 2012, Saint Paul's filed its appeal brief with the SACS Appeals Committee.  A copy of the brief filed by Saint Paul's is attached hereto as **Exhibit J**.

25.     On August 12, 2012, the Commission filed its response brief with the SACS Appeals Committee.   A copy of the response brief is attached hereto as **Exhibit K**.

26.     On August 20, 2012, the immediate past and current interim Presidents of Saint Paul's College, a Board of Trustees member, and four other employees from Saint Paul's testified before the Appeals Committee.  A copy of the transcript is attached hereto as **Exhibit L**.

27.     In a letter dated August 22, 2012, the Chair of the Appeals Committee notified the College that its appeal was denied.  The denial letter is attached hereto as **Exhibit M.**

28.     Finally, on August 27, 2012, counsel for Saint Paul's sent a letter to the chair of the SACS Appeals Committee detailing Saint Paul's concern that the Committee's decision was deficient for various reasons, which will be discussed in detail below.  A copy of the letter is attached hereto as **Exhibit N**.

### *SACS Violated its Own Policies When It Refused to Consider Good Cause*

29.     Pursuant to SACS' Removal Policy, which is attached hereto as **Exhibit O**, the SACS Board of Trustees can remove an institution from SACS membership "if [the institution] has not demonstrated compliance with all the *Principles of Accreditation* within the two-year monitoring period *and* has not demonstrated Good Cause as to why it should not be dropped from membership." p. 2 (emphasis added).

30.     The decision to remove Saint Paul's from SACS was clearly not made in accordance with the Removal Policy.

31.     The June 28th removal notice states that the Board's decision to remove Saint Paul's from membership was based on the SACS Committee on Compliance Report's finding that the College allegedly failed to comply with the following provisions of the *Principles of Accreditation*:

- Core Requirement 2.11.1 (Financial resources);
- Comprehensive Standard 3.3.1.2 (Institutional effectiveness: administrative support services);
- Comprehensive Standard 3.3.1.3 (Institutional effectiveness: academic and student support services);
- Comprehensive Standard 3.5.4 (Terminal degrees of faculty); and
- Comprehensive Standard 3.10.1 (Financial stability).

32.     Further, there was no reference to "Good Cause" in the June 28th letter.  In fact, during the appeals hearing, SACS' counsel specifically admitted

that: "good cause was not an option, and it was not considered."  *See* Exhibit I, Tr. 117:23-24.

33.    The decision by the Board of Trustees, as made evident by the contents of the June 28th letter, however, does not conform with the Removal Policy because the Policy explicitly requires the Board to consider both the institution's compliance with the *Principles of Accreditation and* an institution's demonstration of "Good Cause" as to why the institution should not be removed from SACS membership.  *See* Exhibit O.

34.    The Removal Policy explicitly and clearly includes provisions for extending an institution's accreditation in circumstances in which the institution "has not remedied [its] deficiencies at the conclusions of its two-year maximum monitoring period and demonstrates Good Cause as to why its accreditation should not be removed."  *Id.*

35.    Here, the June 28th letter from the Board of Trustees demonstrates that it failed to make a finding on whether Saint Paul's demonstrated "Good Cause." Rather, the SACS Board of Trustees limited its analysis to a single question: whether Saint Paul's complied with the *Principles of Accreditation*.

36.    Before the SACS Appeal Committee, Mr. McKee, counsel for SACS, specifically admitted that "good cause … *was not considered*" by SACS in its July

2012 action revoking Saint Paul's accreditation.  *See* Exhibit L, Tr. 117:21-117:24 (emphasis added).

37.    Additionally, the SACS Appeals Committee itself disregarded the Removal Policy when it completely dismissed the "Good Cause" requirement in the removal policy by failing to discuss it in its final decision letter.  *See* Exhibit M.

38.    This failure to consider the Good Cause shown by Saint Paul's is in clear violation of the procedures of the Removal Policy.   Because the written adverse determination failed to mention or rule on whether Saint Paul's demonstrated Good Cause, the adverse determination is deficient on its face. Similarly, the statements made by counsel for SACS also demonstrate that none of the relevant bodies within SACS considered good cause, in clear violation of SACS' policies.

### SACS' Failure to Follow the Second Prong of the Removal Standard Was Material

39.    SACS' failure to even address a "Good Cause" determination regarding Saint Paul's not only violated the Removal Policy's procedures, but also was a significant factor leading to the Board's ultimate decision to remove Saint Paul's from SACS membership.

40.    Over the last year, Saint Paul's has made significant improvements and SACS-acknowledged progress towards becoming fully compliant with the *Principles of Accreditation*, including repaying a majority of its debt, adding terminally degreed faculty, and enhancing academic and administrative institutional effectiveness.   In addition, the administrative record in this matter shows that Saint Paul's had, and continues to have, the potential to become fully compliant during an extended "good cause" period – the very purpose of the "Good Cause" provision.

### SACS' Violated its Own Policies When it Summarily Denied Saint Paul's Appeal

41.    SACS's own procedures require that the SACS Appeals Committee address "all" of the asserted grounds for appeal, and that the Committee provide "specific reasons" for its affirmation or denial of each of the grounds for appeal stated by the institution.  SACS' Appeals Policies are attached hereto as **Exhibit P**.

42.    The August 22, 2012 letter decision, *see* Exhibit M, fails to satisfy these requirements for at least two discrete reasons.

43.    First, SACS's own Removal Policy explicitly requires the Board not only to consider an institution's compliance with the *Principles of Accreditation*, but also an institution's demonstration of "Good Cause" as to why the institution should not be removed from SACS membership.

44.    Thus, the Removal Policy explicitly and clearly includes provisions for extending an institution's accreditation in circumstances in which the institution has failed to comply with the *Principles of Accreditation* by specifically allowing an institution that has demonstrated "Good Cause" to remain accredited for one additional year if the institution "has not remedied [its] deficiencies at the conclusions of its two-year maximum monitoring period and demonstrates Good Cause as to why its accreditation should not be removed."  *See* Exhibit O.

45.    Here, the SACS Board of Trustees not only failed to make a determination that Saint Paul's College had demonstrated "Good Cause," but also, as shown in the June 28, 2012 adverse determination letter, failed to even consider in the first instance whether Saint Paul's College had demonstrated "Good Cause." *See* Exhibit I.

46.    Rather, the SACS Board of Trustees limited its analysis to a single question: whether SPC complied with the *Principles of Accreditation*.

47.    Accordingly, Saint Paul's College argued on appeal that because the written adverse determination failed to consider whether Saint Paul's had demonstrated "Good Cause" to forestall any removal decision, the adverse determination was deficient on its face, thereby requiring the Committee to remand

the case to the Board of Trustees for failing to follow its own required process. *See* Exhibit L, Tr. 7:23 – 8:7.

48.    In the August 22 letter decision, the SACS Appeals Committee stated that Saint Paul's had not shown that the Board of Trustees had "failed to follow its [own] procedures" because the Board of Trustees "followed its policies and procedures with respect to the length and termination of the probationary period of Saint Paul's College." *See* Exhibit M.

49.    Through this superficial statement, SACS has *yet again* failed to actually address the SACS Board of Trustee's straightforward failure to engage in the required conjunctive test for removal of accreditation.

50.    Second, at the hearing, Saint Paul's addressed the decision of the Board of Trustees with respect to the following areas of concern: (1) financial resources; (2) administrative support; (3) student support services; (4) terminal degrees of faculty; and (5) financial stability.

51.    Saint Paul's detailed the significant progress it had made in all of these areas during the monitoring period.  Nevertheless, in response to *each* of these areas of inquiry, the Committee issued the following conclusory, reasonless statement in its August 22 letter decision:

a. "The Appeals Committee found the [SACS] Board of Trustees decision to be reasonable, not arbitrary, and based on the standard cited. The decision of the Commission is supported by substantial evidence available to the visitors, reviewers, and the Commission as contained in the administrative record and as attested to in the testimony on Appeal." *See* Exhibit M.

52.     No further explanation for the SACS Committee's decision is provided.

53.     This type of conclusory and boilerplate response to each of the areas of concern is insufficiently specific to satisfy SACS's own appeal procedure. Each of these issues was the subject of extensive testimony at the hearing. Yet, the decision letter does not specify the reasons for each of the decisions reached, nor does it provide specific reasons supported by the purported "substantial evidence" as to why the Committee accepted the decision of the Board of Trustees over the competing testimony of Saint Paul's College.

54.     Rather, the Committee simply incorporated by reference the entirety of the administrative record without any attempt to explain the basis for its adverse decision. That is improper and in violation of SACS own policies and procedures.

### *SACS Position on Its Policies Is in Direct Contravention with Those of the Department of Education*

55.    SACS is a regional accrediting agency that is recognized by the United States Department of Education ("DOE").  SACS' policies and procedures are based upon regulations promulgated by the DOE.

56.    DOE's Enforcement of Standards provision provides that "[i]f an institutional program does not bring itself into compliance within the specified period, the agency must take immediate adverse action *unless* the agency, *for good cause*, extends the period for achieving compliance.  34 C.F.R. § 602.20(b)(iii) (emphases added).

57.    The notion of good cause as a basis for extending an institution's accreditation period is reflected in the DOE policies upon which SACS' policies are based.

58.    Because SACS failed to complete both steps of the two-prong process, SACS failed to comply with DOE regulations expressly applicable to the facts presented here and, further, failed to properly apply its own policies and procedures which are based on these regulations.

### *SACS Denied Saint Paul's Federal Common Law Due Process*

59.    Private accreditation bodies must afford common law due process to member institutions.

60.   As set forth above, SACS denied Saint Paul's common law due process by failing to follow its own rules, procedures, and policies in deciding to strip Saint Paul's of its accreditation even when the Board of Trustees and the Appeals Committee failed to find that "good cause" did not exist.

61.   SACS also denied Saint Paul's a meaningful opportunity to be heard by creating a system and a process that was designed to fail.  On appeal, the Committee members asked Saint Paul's employees and staff for specific financial figures.  *See* Exhibit L at Tr. 30:19-31:8.   Upon providing the number, the Committee asked whether the statements were "college numbers" or from an "audited statement."  *Id.* at  Tr. 30:23-31:4.

62.   The express testimony of SACS' staff was that the staff would only consider audited financial information, i.e. financial statements audited by an independent public accounting firm.  "So in our review we focused on information that was verifiable.  We relied … on the audited information …. The institution did submit multiple internally prepared financial information and projections for our review that could not be verified.  In other words, it was internally prepared and it did show improvement.   However, the committee could not rely upon the information as it could not be verified."  *Id.* at Tr. 88:21-89:7.

63.     Yet, SACS Appeals Procedures allow institutions to submit current financial information prepared by the institution without any requirement that the financial information be audited.   Prior to the appeals hearing, SACS never apprised Saint Paul's, either orally or in writing, that SACS would only accept audited financial statements to document the progress that Saint Paul's had made. At and before the appeals hearing, SACS acknowledged and admitted that Saint Paul's had made sufficient progress, but argued that it could not "document" such progress.

64.     Indeed, the term "audited statement" does not even appear in SACS policies and procedures or appeals policies.   Likewise, SACS' policies and procedures nowhere state that progress may only be established through the submission of audited financial statements.

65.     Given the sequence of events and the timing of preparing and obtaining an audited financial report, it was *impossible* at the time of the appeals hearing to be in possession of an audited financial statement for the recent annual information, particularly where Saint Paul's had not been advised in advance of this new SACS "requirement" that is not located in any written SACS policy or procedure.

***SACS Acted Arbitrarily and Unreasonably in Stripping Saint Paul's of its Accreditation and that Decision Was Not Supported by Substantial Evidence***

66.     A decision by an accrediting association is invalid if the decision is arbitrary or unreasonable, or if the decision is not supported by substantial evidence.

***SACS' Policies and Process Did Not Allow Sufficient Time to Obtain the Required Financial Information***

67.     As discussed above, SACS policies required audited financial statements to prove compliance with the financial requirements.

68.     In other words, the only way to remove the financial deficiencies and prove compliance was to provide audited statements, which required more time than SACS provided, particularly for the last six months of financial statements.

69.     For SACS to implicitly require unaudited statements but yet fail to provide the time to acquire them simply sets Saint Paul's up to fail, which is exactly what happened here.

70.     It is clear that these policies are arbitrary because Saint Paul's apparently could never have met these untenable standards, SACS knew this, never advised Saint Paul's yet continually notified Saint Paul's that it was on the right track to maintain its accreditation.

***SACS' Removal of Accreditation was a "Catch 22"***

71.    Beginning in June 2010, Saint Paul's began correcting its deficiencies and by June of 2012 the College had remarkable momentum.  Saint Paul's had substantially corrected many of its shortcomings, namely, the College's physical facilities, fundraising commitments, debts, operational budget, number of applications, pro formas, terminally degreed faculty, and even the auditor's removal of the going concern issue.

72.    For example, Saint Paul's received a setback when it was given a "going concern" notation in its previous audited financial statements.  After careful review of these statements, though, the auditors conceded that a mistake had been made when they cited a line of credit as a long-term debt rather than a short-term debt.  The auditors had agreed to remove the "going concern" notation.  The College also had received millions of dollars in pledges and endowment donations after extensive fundraising efforts by Saint Paul's. Moreover, the College had a letter from a local bank offering to extend a line of credit based on long-term assets.

73.    As was to be expected, however, all of these positive advancements were contingent upon the College's continued accreditation.   When SACS removed Saint Paul's accreditation, all of the positive contributions and promises

the College received from alumni, friends, and donors, were taken away. Now, SACS asserts that Saint Paul's was not in compliance with its policies and standards – a scenario that would not exist *but for* SACS' removal of Saint Paul's accreditation and, therefore, among others, the College's loss of donations, funding, and terminally degreed faculty.

74. SACS' Policies are inherently arbitrary and capricious because they ensured Saint Paul's failure by refusing to allow it to succeed.

### SACS Violated the Higher Education Act of 1965 in Deciding to Strip the College of its Accreditation

75. Saint Paul's has long been a participant in various federal aid to higher education programs, including federal student assistance programs provided under Title IV of the Higher Education Act ("HEA") of 1965.

76. Eligibility to participate in these federal aid programs is determined by the United States Secretary of Education. In determining the eligibility of a state-licensed institution of higher education such as Saint Paul's, however, the U.S. Secretary of Education relies on the decisions of regional accrediting associations, such as SACS, which the Secretary has "recognized" in accordance with the provisions of 20 U.S.C. § 1099b as the exclusive institution-wide accrediting agency within the southern United States.

77.    The Commission's decision to strip the College of its accreditation provides the U.S. Secretary of Education cause to determine that the College is ineligible to continue its participation in the federal programs.  Saint Paul's, thus, has a vital interest in insuring that SACS complied with its rules and regulations, as well as the requirements imposed upon accrediting agencies by the HEA and the regulations promulgated thereunder, with respect to any review or investigation that could impact its accreditation.

78.    The HEA requires "recognized" agencies, such as SACS, to afford due process to institutions, such as Saint Paul's, with regard to accreditation decisions.  The statute expressly requires SACS to "apply procedures throughout the accrediting process … that comply with due process." 20 U.S.C. § 1099b(a)(6).

79.    The implementing regulations promulgated by the U.S. Secretary of Education similarly require SACS to comply with due process.  These regulations have an entire section captioned "Due Process," which provides, *inter alia*, that "[t]he agency must demonstrate that the procedures it uses throughout the accrediting process satisfy due process." 34 C.F.R. § 602.25.

80.    The Commission violated HEA when it violated the College's due process rights, including as described above, in reaching its decision to strip Saint Paul's of its accreditation.

81.    Saint Paul's has been irreparably harmed by SACS' violations of HEA.  The College, therefore, is entitled to permanent injunctive relief.

### *The Irreparable Harm Suffered by Saint Paul's College*

82.    Saint Paul's College has an average enrollment of over 400 students. When the College received the June 28, 2012 Notice that it lost its accreditation, *see* Exhibit I, Saint Paul's decided to shut down a majority of its classes until the SACS Appeals Committee ruled on Saint Paul's appeal.  Currently, though, forty-six students are enrolled in Saint Paul's Accelerated Learning Program.  Without accreditation remaining intact, students are currently taking courses that are now worthless for academic credit purposes.  The time the students spent inside and outside the classroom preparing for the course cannot be recovered.

83.    Normally, over 90% of Saint Paul's students receive some sort of financial aid to attend school – most of which comes from Federal funding. Currently, all of the students that are attending Saint Paul's receive Federal funding.  If the College's accreditation is not reinstated, all of the Federal funding will be immediately withdrawn, and the students will be unable to attend school.

84.    Loan agreements for operating funds and capital expenditures may be in default because Saint Paul's has lost its accreditation.  Without relief these creditors will, in all likelihood, demand immediate payment of the debt.  If

accreditation is not reinstated, Saint Paul's assets may very well be picked apart by these creditors and there will be no more school left for students to attend.

85.   Saint Paul's will also suffer further irreparable reputational damage which may defeat its ability to identify and consummate a potential merger with another private or public institution.   The College may be unable to engage in productive merger discussions when it is an unaccredited university.

86.   The College is currently and will continue to suffer immediate, irreparable, and material loss and injury.   This loss is not compensable through money damages for many reasons, including the worthlessness that will attach to classes currently being taken by students of Saint Paul's.

87.   The College seeks a permanent injunction enjoining enforcement of SACS' policies until these policies are applied and enforced in accordance with their plain meaning consistent with the Department of Education regulations upon which the SACS policies are founded.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>

**SACS FAILED TO FOLLOW ITS OWN RULES IN REMOVING SAINT PAUL'S COLLEGE'S ACCREDITATION**

88.     Saint Paul's incorporates the allegations set forth in paragraphs 1 through 87 above as if set forth fully herein.

89.     In reviewing the accrediting association's decision to withdraw a member's accreditation, the primary focus is on whether the accrediting body's internal rules provide a fair and impartial procedure and whether the association followed its own rules and policies in reaching its decision.

90.     Pursuant to SACS' Removal Policy, *see* Exhibit O, the SACS Board of Trustees can remove an institution from SACS membership "if [the institution] has not demonstrated compliance with all the *Principles of Accreditation* within the two-year monitoring period *and* has not demonstrated Good Cause as to why it should not be dropped from membership." p. 2 (emphasis added).

91.     The decision to remove Saint Paul's from SACS was clearly not made in accordance with the Removal Policy.

92.     In fact, SACS' failure to consider Good Cause shown by Saint Paul's was in clear violation of the procedures of the Removal Policy.    The adverse

determination is deficient on its face because the written adverse determination failed to mention or rule on whether Saint Paul's demonstrated Good Cause. Similarly, the statements made by counsel for SACS also demonstrate that none of the relevant bodies within SACS considered good cause, in clear violation of SACS' policies.

93.    SACS' failure to even address a "Good Cause" determination regarding Saint Paul's not only violated the Removal Policy's procedures, but also was a material and significant factor leading to the Board's ultimate decision to remove Saint Paul's from SACS membership.

94.    Moreover, SACS failed to follow its own procedures by failing to address "all" of the asserted grounds for appeal, and by failing to provide "specific reasons" for its affirmation or denial of each of the grounds for appeal stated by the institution. *See* Exhibit P.

95.    The August 22, 2012 letter decision fails to satisfy these requirements.

96.    This is improper and in violation of SACS own policies and procedures.

## COUNT II

### SACS DENIED SAINT PAUL'S COLLEGE COMMON LAW DUE PROCESS IN DECIDING TO STRIP THE COLLEGE OF ITS ACCREDITATION

97.     Saint Paul's incorporates the allegations set forth in paragraphs 1 through 96 above as if set forth fully herein.

98.     Private accreditation bodies must afford common law due process to member institutions.  The essential elements of common law due process are notice and a meaningful opportunity to be heard.

99.     As set forth in Count I of this Complaint, SACS denied Saint Paul's notice and a meaningful opportunity to be heard by failing to follow its own rules, procedures, and policies in deciding to strip Saint Paul's of its accreditation even when the Board of Trustees and the Appeals Committee failed to find that "good cause" did not exist.

100.   SACS also denied Saint Paul's a meaningful opportunity to be heard by creating a system and a process that was designed to fail, namely by requiring audited financial documents without giving Saint Paul's prior notice that they were required.

## COUNT III

### SACS ACTED ARBITRARILY AND UNREASONABLY IN STRIPPING SAINT PAUL'S COLLEGE OF ITS ACCREDITATION AND THAT DECISION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

101.   Saint Paul's incorporates the allegations set forth in paragraphs 1 through 100 above as if set forth fully herein.

102.   A decision by an accrediting association is invalid if the decision is arbitrary or unreasonable, or if the decision is not supported by substantial evidence.

103.   For SACS to implicitly require unaudited statements but yet fail to provide the time to acquire them is a "Catch 22" and simply sets Saint Paul's up to fail.

104.   It is clear that these policies are arbitrary because Saint Paul's apparently could never have met these untenable standards, SACS knew this, never advised Saint Paul's yet continually notified Saint Paul's that it was on the right track to maintain its accreditation.

105.   SACS' Policies are inherently arbitrary and capricious because they ensured Saint Paul's failure by refusing to allow it to succeed.

## COUNT IV

## SACS VIOLATED THE HIGHER EDUCATION ACT OF 1965, AS AMENDED, IN DECIDING TO STRIP THE COLLEGE OF ITS ACCREDITATION

106.   Saint Paul's incorporates the allegations set forth in paragraphs 1 through 105 above as if set forth fully herein.

107.   Saint Paul's has long been a participant in various federal aid to higher education programs, including federal student assistance programs provided under Title IV of the Higher Education Act of 1965.

108.   Eligibility to participate in these federal aid programs is determined by the United States Secretary of Education.

109.   The HEA requires "recognized" agencies, such as SACS, to afford due process to institutions, such as Saint Paul's, with regard to accreditation decisions.   The statute expressly requires SACS to "apply procedures throughout the accrediting process … that comply with due process." 20 U.S.C. § 1099b(a)(6).

110.   The implementing regulations promulgated by the U.S. Secretary of Education similarly require SACS to comply with due process.   These regulations have an entire section captioned "Due Process," which provides, *inter alia*, that "[t]he agency must demonstrate that the procedures it uses throughout the accrediting process satisfy due process." 34 C.F.R. § 602.25.

111.   The Commission violated HEA when it violated the College's due process rights, including as described above, in reaching its decision to strip Saint Paul's of its accreditation.

112.   Saint Paul's has been irreparably harmed by SACS' violations of HEA.  The College, therefore, is entitled to permanent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Saint Paul's College respectfully asks the Court to grant them the following relief:

1.   An Order: (a) reversing the decision of SACS which removed the College from its membership and restoring the College's accreditation; or (b) reversing the decision of SACS and issuing a remand to require SACS to reconsider its decision to remove the College from its membership consistent with due process requirements, SACS' own policies,  and the Department of Education's regulations; and

2.   Such other and/or additional relief as equity and the nature of the case may require, including but not limited to the award of attorneys' fees and costs.


Respectfully submitted,

**SAINT PAUL'S COLLEGE**

By */s/ Mark H. Cohen*

Mark H. Cohen (Ga. Bar No. 174567)
TROUTMAN SANDERS LLP
600 Peachtree Street, NE, Suite 5200
Atlanta, Georgia 30308
Telephone:  404.885.3597
Facsimile:   404.962.6753
mark.cohen@troutmansanders.com
*Attorney for Plaintiff, Saint Paul's College*

Ashley L. Taylor, Jr.* (Va. Bar No. 36521)
David N. Anthony* (Va. Bar. No. 31696)
Virginia Bell Flynn* (Va. Bar. No. 79596)
TROUTMAN SANDERS LLP
1001 Haxall Point, P.O. Box 1122
Richmond, Virginia  23219
Telephone:  804.697.1200
Facsimile:  804.698.5147
ashley.taylor@troutmansanders.com
david.anthony@troutmansanders.com
virginia.flynn@troutmansanders.com
*Attorneys for Plaintiff, Saint Paul's College*
*\*applying for admission Pro Hac Vice*

## VERIFICATION OF COMPLAINT

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint and the factual allegations thereof and that to the best of my knowledge the facts alleged therein are true and correct.

Executed this 28th day of August, 2012.

s/ *Claude Flythe*
Claude Flythe, Ph.D., Interim President & CEO
Saint Paul's College

20085178v1